And may it please the court, Charles Conrad on behalf of the city of Spokane. Your Honors, I think the first thing we need to recognize is that this is a matter of litigation that's occurred all across the country, and we're getting to the end of it. It's winding down. We have this circuit and we have the Eleventh Circuit with which to address these issues. Has anyone agreed with you yet? Not a one, Your Honor. I thought you had a pretty tough argument here. I do, Your Honors, but I think the thing that we need to consider, this case is so rare, because we have the opportunity to consider the relationship between the two sovereigns in our form of government that has been going on since McCulloch v. Maryland, and rarely does this come before the courts. Rarely does it come before the courts in such a manner as it has in this case, where we have a state tax that is trying to be imposed upon a private actor. And the federal government has come down, and it has legislation, and it says that, you know, they're exempt from all taxation. But they were created by the federal government. They were. For a specific purpose. They were created by the federal government, and the language is from 12 U.S.C. 1776, or to establish secondary market facilities. So it was created by the government. And at one point in time, it was probably managed by the government. And these facts are not before the court. The instrumentality analysis that is properly done by LeBron, which is before the court, would lead us to indicate that it's not a federal instrumentality. In fact, every case, as far as I know, that's been cited and treated the issue as to whether or not Fannie Mae and Freddie Mac are governmental instrumentalities, after that decision, have found that they were not. And the defense and the appellees in this case have not cited to anything after that. Yes, Your Honor. I was just going to say, well, you know, the federal government created these entities for a specific purpose. Yes. To promote a secondary mortgage market, which has a substantial impact on interstate commerce. You know, I don't see how you really get around that. Okay. May I try to convince you, Your Honor? Yes. I think that what we have to look to is the rational basis test that should be in play in this case. And that's the rational basis that's explained in Lopez, Morrison, Rake. Okay. I think that if we should set aside the instrumentality issue for right now. I think that that is a question that is very fact specific. And for the purposes of this appeal, we alleged, as a matter of fact, that it was not in the complaint. We alleged that it was a nongovernmental entity. I think that the court should take that as true. I think that moving from that position, we have to analyze whether or not, under the rational basis analysis in play in this case, whether Congress exhibited a clear and manifest intent to limit Washington State's right to collect a tax on the transfer of real property within its borders.  They indicate that there's something, maybe a little bit more than standard rational basis, that should be left to be determined. And the clear and manifest intent prong of their analysis is based upon Rice, which is a preemption case. And in that case, it said, in order to determine whether or not the clear and manifest intent has been made, that the scheme of federal regulation may be so persuasive as to make reasonable the inference that Congress left no room for the states. We're not in an area of pervasive regulation. The secondary mortgage market is regulated by an entirely different body of law. This is a publicly traded private corporation engaging in business in the state of Washington. But if we determined, and I'm just saying this hypothetically, and the exemptions are constitutional exercises of congressional authority under the Commerce Clause, do we have to even consider whether Fannie Mae and Freddie Mac are exempt from state and local taxes under the Supremacy Clause as federally chartered but privately owned corporations? Your Honor, I want to make sure that I understand your question. Are you asking me that if you determine that it is Congress's ability to make the law that it did? If we determine that Congress has the authority under the Commerce Clause to regulate the secondary mortgage market, do we have to consider your second argument there? Yes, Your Honor. I think yes. Why? Well, because Congress is not regulating the secondary mortgage market in the statutes that created Fannie Mae and Freddie Mac. And so I would say that those statutes were created and drafted by Congress, and then Fannie Mae and Freddie Mac were created, and then it's as if Congress said go forth into the world and compete like any other private entity. And so whether or not Congress has the authority to engage in the secondary mortgage market and regulation of that area, I would not oppose that premise. But what I am saying is that doesn't occur here. What you have is you have two corporate entities that are engaged in the private act and in business. And they have a federal charter. They do have a federal charter, Your Honor. And Congress thought that they were necessary to further the interest of the secondary mortgage market. And so if we look at whether or not, and I don't dispute what you're saying, Your Honor, but the analysis is six parts to determine that, is whether, you know, we have to determine under the rational basis analysis whether or not it was clear and manifest intent. I think Morrison and Lopez and Rake make clear that there should be a jurisdictional statement as to that analysis. And I think that there should be a statement as to whether or not Congress intended and evaluated the impact on interstate commerce, which is absent here. Now, excuse me, Your Honor. So let me ask you, so if they had included such a statement, we wouldn't be here today? Your Honor, I certainly don't want to waive my argument, but I think it would be a very different framework if it were such. But the record doesn't have one. No, but we know what Congress was up to when they created Fannie and Freddie. Well, we know that when Fannie was created that they were trying to work on problems with the Depression. And we know when Freddie Mac was created that they were trying to create a competitor for Fannie, trying to create competition in a free market as a publicly traded corporation. Well, you know, behind it there's some policy considerations as well that Congress is attempting to further. I, Your Honor, I don't. Promoting the availability of mortgage money. Pardon? Promoting the availability of money to fund mortgages. I am, you know what, Your Honor, I understand that. They were trying to create liquidity. But the thing that we have to remember is that what Fannie Mae and Freddie Mac are saying is if under their rational basis construction, they're saying if we are forced to pay this tax, then we may be prevented from doing what we say is our primary function, which is supporting the secondary mortgage market. But we know, and the Court must take true as a matter of fact, that they pay the tax in California, in counties of California, and that they do so without any infringement on their ability to perform their function. This tax is not a limitation to their ability to conduct business. This tax is not going to hinder their purpose. But in McCullough, that was not the question the Court decided, was whether it thought that the tax was sufficient to put it out of business, although it surely was its purpose. No, but yes, Your Honor, that's correct. That was not considered in McCullough. So why does the degree sort of matter here? The principle seems to be the important thing, that if you can tax it, then you can tax it out of existence if you wished. If you may tax it, you may destroy it. And, in fact, that's what the appellees have argued is that, you know, excessive taxation. We don't really – the principle is firmly established, so we don't really have to ask whether it's too much tax, whether it's going to hurt it in fact. We only have to ask about the principle. But doesn't the principle take us back to the question of whether or not this is a federal entity or not? Because if the question is under the supremacy clause, whether the states may tax the federal government, that question established in McCullough, then don't we have to ask here whether these are federal entities or not? Or is it possible for Congress to create an entity, let's say a charter, a corporation, set it free and then imbue it with the same immunity that federal entities would have? Your Honor, yes, we can discuss the nature of the instrumentality. The case law is not clear at this point, I don't think, as to whether or not Congress may create a privately held corporation. And so by that I mean something that's traded on the New York Stock Exchange, answerable to its shareholders, and gone forth into the world where its board of directors are not managed by the government and then be shielded by the tax immunity that you are describing. Because in those cases where such tax immunity was granted, it was determined that these were instrumentalities. Or it was determined, to your point, Your Honor, and what we should look at is whether or not Fannie and Freddie Mac are governmental instrumentalities. We have agreed and we state that if they are determined to be instrumentalities, then our case fails. But they are not governmental instrumentalities. They are corporations whose stock is traded on the National Stock Exchange who have a board of directors elected by its shareholders, predominantly public. There's the issue of conservatorship. However, we would say that the conservator stands in the shoes of Fannie Mae and Freddie Mac, not vice versa. That's in our briefs. Yes, Your Honor. Well, you know, I'm listening to your argument and I'm just thinking of the cases that, you know, the 11th Circuit, the 7th Circuit. Oh, yeah. Not the 11th, the 7th, the 4th Circuit.  The others. I mean, how did they get it wrong? I think that they didn't. It's a great question. And with the most respect, this is the question that I knew that the panel was going to have to put to me. And with the greatest respect, they failed to analyze the cases under the rubric of Lopez and Morrison because under that analysis as to whether or not it constitutes a permissible act under the Commerce Clause, I think it fails because there isn't the jurisdictional statement, because there is not the legislative history that we can look to, and it's not in the record. And then even, and it's important to note this, even the appellees say in response to our argument of a heightened sense of scrutiny that the clear and manifest prong of this rational base analysis meets that test, meets that burden. And unfortunately, they leave it at that. They don't go on to say, well, what does clear and manifest mean under the law? And how is that determined? But the truth of the matter is under the law, this statute doesn't get there. And it's very, very, very easy to see how the other courts went this way. I can see why. But it's incorrect. And the thing at stake here is that there is the absolute risk that the approval and affirmance of the lower court will create a situation where the federal government and Congress may abrogate any state tax. That cannot be the proper result, and that cannot be what we understand in our dual sovereignty form of government. It cannot be the result. But that is the tacit approval that this court will make. Tacitly, it will approve the destruction of a state's ability to tax. Has the federal government ever done this in any other instance? Has the federal government ever done what, Your Honor? This exempting payment of something like an excise tax? Yes, Your Honor. And what is the result? Your Honor, the result was not in my favor. That's right. However, I don't know that that's the correct position that we should take. And we have an opportunity. To go where no one has ever gone. Boy, but without it, what is the state left with? Let me ask you this, practically speaking. I'm not quite sure. Maybe you could just. Your Honor. I'm just kind of curious on a practical level. How much money is at stake? On a practical level, in the city of Spokane, it's one-half of 1%. And so the amount of money involved is not great. I mean, I guess. It's not small. I guess Fannie and Freddie could pay if they wanted. If they wanted to be good neighbors. They could pay it. Yeah, this isn't going to put anybody out of business. This isn't going to be something that's going to be burdensome. But I gather the problem, though, is it's nationwide. In fact, Your Honor. Because Fannie and Freddie buy mortgages throughout the country. And I understand the road that you're taking me down, Your Honor. And it adds up, right? But they have said that it is not to be determined in the aggregate, and they're briefs. So we have to look at, and based upon their own statement. Well, I'm just. I understand that. I understand that. I know what you mean. Your Honor, I would like to reserve the remainder of my time for rebuttal. Thank you very much. Thank you, Your Honors. May it please the Court. I'll reserve four minutes for my friend and colleague, Mr. Erta, for the United States. To rule for appellants, this Court would have to disregard Supreme Court precedent and create a split with at least six other circuits. Panels of each. You're Mr. Johnson. Correct. Okay. Panels of each of those six on one issue, seven on another circuits, have unanimously ruled in favor of appellees. Indeed, in dozens of district court actions presenting exactly the same issues here, no judge, no district court judge, no circuit court judge, not a single judge of those dozens has accepted any of the positions the appellants This is the Ninth Circuit. Yes. I was just going to say. Remember, you're in the Ninth Circuit. I understand that, Your Honors. And that's why I say this Court would have to disregard Supreme Court precedent on each of the issues. I didn't hear my friend and colleague address the carve-out issue. I'm happy to rest on the briefs on that. I think it's clear that Wells Fargo and Detroit, among many other cases, resolve that clearly in our favor. Here's the question that I just want to make sure that I'm clear on. So can Congress create wholly private entities and make them immune from state taxes? Yes. Absolutely. And I would point the Court to a number of decisions where Congress has exempted purely private activity from state and local taxation. The Supreme Court affirmed a statute that did that in Exxon, that's CERCLA, which expressly preempts certain kinds of state and local taxes. And the Supreme Court observed that Congress's motivation in enacting that provision was a concern that states had overtaxed a particular private industry. So Congress worried that states are overtaxing the petrochemical industry. And all of this is attributable to the Commerce Authority. CERCLA is a Commerce Clause statute. Now, I want to be fair to the Court and to my friends on the other side. The Supreme Court did not evaluate the Commerce Clause authority for that provision of CERCLA in the Exxon v. Hunt case, but that's a case where the Court affirmed the application of a federal statute that preempted certain state and local taxes. The Court did the same thing in the first Agricultural National Bank of Berkshire County case. And that case is virtually on all fours with this case. Financial institutions chartered by the federal government, their national banks, here Fannie Mae and Freddie Mac. Congress enacts a statute that delimits the way the states can tax those institutions. Now, the particular provisions differed. The national bank statute said, essentially, here are the ways, state, that you may tax national banks. You can't do anything else. In our case, the statute is almost the inverse. It says, states, you can't tax Fannie Mae and Freddie Mac at all, except for this carve-out that allows you to impose taxes on their real estate, not on the entity, on the real estate. Could Congress say you may tax them up to a certain level? Could it be that specific to say you can tax them at a 25% rate on whatever base we're going to choose? There's no precedent suggesting that. And that starts to get, perhaps, a little closer to the commandeering-type cases, but that's not what happened here. I think, in truth, Congress's ability to preclude state taxation entirely probably authorizes Congress to prescribe the specific forms of tax, as was the case in the first Agricultural National Bank case. Now, when it gets into micromanaging, I think the takeaway has to be that, yes, Congress could do that. Now, whether that would be a smart or desirable thing for Congress to do, whether the states would be able to fight back using their access to the political process, as the Court suggested they readily could in the Garcia decision, I think are all important questions. The Sneed case, another case where Congress enacted a statute that limited the ways states could tax particular private enterprises. That was a statute that said you can tax power plants in some ways but not others. The Supreme Court affirmed that statute. The Aloha Airlines case, another statute said you cannot tax airlines based on their gross income or per-passenger tax. The Supreme Court affirmed that tax. Bismarck, Pittman, Lawrence, all these cases, those three especially, were about entities created by Congress to fulfill a specific federally important mission, pervasively regulated by the federal government to ensure their adherence to that mission. It's not just those cases, though. If we look at what the Supreme Court has said in cases where it specifically analyzed the relationship between the dual sovereignty issues, which the Court considers very important, look at the U.S. versus New Mexico case. In one paragraph, it notes the delicate balance between the federal government and state sovereignty. And in the very next paragraph, it says, okay, these entities, federal contractors, are not constitutionally immune from state excise taxes, but if Congress wants to immunize them, that's Congress's prerogative. Now, I just can't imagine that the Supreme Court would include that statement right after a discussion of dual sovereignty if it thought there were a Commerce Clause problem with immunizing particular private entities from state and local taxation. The Supreme Court has made similar statements in the Blaze case, the Detroit case, the Oklahoma Tax Commission case, and in the dormant Commerce Clause context where the issues are slightly different, but it's still informative about the extent of Congress's power under the Commerce Clause, which, after all, there's only one Commerce Clause, in cases like Commonwealth Edison and Oklahoma Lines. The Supreme Court has held certain state taxes aren't so discriminatory as to violate the dormant Commerce Clause, but if Congress has a different view and wants to impose greater restrictions on the state's ability to enact those sorts of taxes, it may do so. So in all those Supreme Court decisions, the Court is saying, of course Congress has the power to do this. Now, I'd also point out that Chief Justice Marshall, back in 1827 in the Brown v. Maryland case that we cite in our briefs, recognized the issue. He described the state power to tax as sacred, but he recognized that sometimes that state power to tax, sacred though it may be, can collide with Congress's power to regulate interstate commerce. And in Chief Justice Marshall's words, what happens in that circumstance is, that which is not supreme must yield to that which is supreme. So when there's a collision between the state power to tax and Congress's power to regulate interstate commerce, Congress's power wins. That's what happened here. Now, my friends on the other side say, well, there's really not any relationship to interstate commerce. This is all local activity. That argument was considered and rejected in Heart of Atlanta. That argument was considered and rejected in Gonzales v. Rake.  When a party comes in and asks the court to put the blinders on and focus on one limited slice of an interstate commercial relationship, a nationwide market, and to put that interstate activity off limits to Congress's commerce power, the Supreme Court says no. That's not how you look at it. Gonzales v. Rake is very important on this point, because in that case, the plaintiffs made a very similar argument as the one plaintiffs make here. They said, hey, the state of California has authorized us to grow marijuana for our own medical use. We're entitled to comply with the state law here, and Congress shouldn't be allowed to regulate in a way that interferes with that state authorization. And the Supreme Court said no, no. If we held that way, we would be upending the supremacy clause. That would elevate the state's power over the federal power, and the founders decided the relationship should be the opposite. My friends suggest that we need legislative history or findings here on the relationship between the secondary mortgage market and interstate commerce. The cases Lopez, Gonzales, they all say if it's visible to the naked eye, there's no need for congressional findings. Here, there's no question that the secondary mortgage market embodies interstate commerce. That's exactly what it is. The whole purpose of Fannie Mae and Freddie Mac is to raise funds in money centers like Seattle and New York and Chicago and Miami and ensure that they can be deployed as mortgage financing in other places like Dubuque or Indianapolis or Fort Worth, and to do it in a way that minimizes the cost of the mortgage finance and ensures that it's done equitably around the country. So Congress had those important commercial objectives in enacting the federal statutory charters of Fannie Mae and Freddie Mac. Let me ask you the same question that I asked appellants counsel. If the panel determines that the exemptions are constitutional exercises of congressional authority under the commerce clause, do we have to consider whether Fannie Mae and Freddie Mac are exempt from state and local taxes under the supremacy clause? No, Your Honor. The Supreme Court looked at that exact question in the first Agricultural Bank of Berkshire County case. The principal point of contention between the majority justices who applied the federal statute that exempted national banks from certain kinds of taxes and the minority was whether the court first had to determine whether national banks were federal instrumentalities or not. The majority held unequivocally it was unnecessary. That's the majority's word. Unnecessary to decide that constitutional issue before giving effect to the statutory immunity Congress had enacted. The same is true here. Now, that said, there are good reasons to believe that Fannie Mae and Freddie Mac would qualify for federal instrumentality status under the applicable test, which this court looked at in the California Credit Union League case. It's similar to the United States versus Michigan case of the Sixth Circuit. And those three factors we talked about earlier are dispositive, where Congress creates an entity by a federal charter, limits it to a specific and important federal mission, and pervasively supervises the entities it created to ensure that they hew to that congressionally important mission they are federal instrumentalities. Now, again, the court need not make that determination here because the statutory immunity applies either way, but to the extent the court deems it important to evaluate Fannie Mae and Freddie Mac are federal instrumentalities. To the extent that the court might read Lopez or Gonzalez or Morrison to require some sort of jurisdictional limitation on the statutes at issue here, there is such a limitation. The statutes only apply to Fannie Mae and Freddie Mac. So the jurisdiction is that it's only these specific entities that get the benefit to which Congress gave jurisdiction to apply these tax immunities. And their charter mission is to do what? In a way that creates more affordable mortgage credit more equitably throughout the nation. They have housing-related missions and goals that are baked into the charters. They are not, as Judge Posner noted for the Seventh Circuit, they're not allowed to change their mind and say we want to start manufacturing locomotives or making kitty litter or trying to invent perpetual motion or other advanced technologies. They're limited to home mortgage finance in the secondary market, not as direct lenders. But that's a detail that's important if you're at Fannie Mae and Freddie Mac, but probably less important in this court. My friends and colleagues on the other side say that, well, there's also a clear and manifest purpose test. And there is. Of course there is. We cited it, the ACF case, which is a tax case, the CSX case, a tax case. There's no question that the Supreme Court is very attentive to the state's sovereign interest in imposing taxes. But the Supremacy Clause says when Congress acts, as under Brown v. Maryland, its views are supreme. The Supreme Court has said we're going to balance that by requiring a clear and manifest statement that Congress intends to preempt state or local taxation. Your Honors, reading the statutes at issue here, where Congress said Fannie Mae or Freddie Mac, including a large number of attributes, shall be exempt from all taxation now or hereafter imposed by any state, county, municipality, or local taxing authority. So the entities shall be exempt from all taxation now or hereafter imposed by any of these subnational political jurisdictions. I can't imagine a more clear or manifest statement of the intent to preempt state and local taxation. How long did you say you were going to give the United States? Four minutes, Your Honor. So I've got about a minute left. I understand. So but Fannie and Freddie, they do pay property tax. They pay property tax. That's carved out specifically in the exemption statute. The entities shall be subject to any real property of the entity shall be subject to state or local tax to the same extent other real property is taxed. So the key words there are real property subject to tax. That means a direct tax. I'm sorry. Which provision are you quoting from? I'm reading from the Fannie Mae provision, which is 12 U.S.C. 1723A. And that one says according to its value. So it allows for a tax according to value. Does the transfer tax attach according to its value? The transfer tax is computed according to its value, but it's not a tax to which real property is subject. And that's true. The Wells Fargo case and the Detroit case, which involved property exemptions and use or transfer taxes, held that. Because this is a one-time tax as opposed to an annual tax, which is a regular property tax? That's one of the indicia. Absolutely, Your Honor. If this were a tax on the property, it would be collected every time the owner holds that right because it's only imposed when the property, and the Supreme Court of Washington so held in the Mahler v. Tremper case, which addresses the local option tax. It's actually a prior version of the tax at issue here. But the Supreme Court of Washington held very clearly, if Your Honor will bear with me. Now, that language is left out of other provisions, the language according to its value. It is. Does that make a difference? No, because the operative language here is that only taxes to which real property is subject are permitted under the exception to the exemption. And that's because this is an in personam tax as opposed to an in rem tax? Is that? It's an excise tax rather than a direct tax, yes. And it's a tax for which the person is liable rather than the property. So, yes, it is an in personam tax. It is not an in rem tax. And the carve out to the exemptions applies only to direct taxes on property. I've gone over my time. Let me just, I have just two very minor questions. Absolutely. So, I just want to make sure I understand how this works. So, if Fannie or Freddie or Fannie own a piece of, have acquired a piece of property here in Seattle, they pay the property tax on it? Absolutely. If that property is transferred, they're exempt? They're exempt from the transfer tax, yes, the excise tax. Could Fannie and Freddie pay the excise tax voluntarily? They could. And plaintiffs attach some deeds, four deeds from one county in California, suggesting that that happens sometimes. That doesn't change the meaning of the statute. No, I understand. But, I mean, could they, I mean, be a good neighbor? That's a business judgment any corporation could make. It would be in the nature of a gift. Suppose Fannie and Freddie hit it big in the stock market. I couldn't only speculate as to what they might do. Would they want to share that with the American public, you know, and help cities and counties? It's a little beyond the scope of this case. In the past, Fannie Mae and Freddie Mac had very robust charitable foundations and did provide a lot of money to a lot of organizations dedicated to other housing-related manifestations of the public good. So, whether it's consistent with the charter, I would leave to another day. Your colleagues are waiting to be heard. Thank you. May it please the Court. Patrick Irda for the United States. Your Honors, as Mr. Johnson has explained, the entity's exemptions from all taxation constituted a proper exercise of the commerce power, and as the district court properly held, the exemptions plain language precludes the taxes at issue here. Turning briefly to the commerce power and to the questions asked by Judge Bybee and Judge Callahan, you don't need to reach the federal instrumentality issue, as Mr. Johnson correctly explained. Rather, the commerce power by itself is sufficient to reach the taxes at issue. Of course, the commerce power extends to anything that substantially affects interstate commerce, and as Judge Paez pointed out, that's precisely what Fannie and Freddie do. They have a nationwide secondary mortgage market. And the manner in which Congress has sought to facilitate that is precisely through these exemptions. That's the way that Congress is achieving its objective, so it's justified as an extension of the commerce power under Rake and Lopez. Obviously under Rake, the fact that it ensnares some intrastate activity does not affect the scope of the commerce power. Turning to the question regarding the real property carve-out and the valuation, actually the Supreme Court in the Southern Railway Company case, which a police site, I think it's 260 U.S. 530, recognizes that measuring by property value does not make a tax a property tax. And as Mr. Johnson correctly stated, a property tax is distinguished in Wells Fargo from an excise tax, which happens when you do something, when you transfer the property, when you make some exercise of a privilege. And that's precisely what we had here. The tax isn't taxed every year of holding the property or holding the right to transfer the property. Rather, it's only taxed when the transfer happens. That differentiates it from a property tax and puts it outside of the exception to the exemption. The Pittman case in the Supreme Court holds precisely that. If there are no questions. Your Honors, quickly, my friend and colleague so eloquently stated that there were three prongs to determine whether or not it was a property tax. And that's whether or not it's created by Congress for a purpose and then is pervasively supervised. And there's nothing before the Court today to show that Congress engages or the federal government engages in pervasive supervision of Fannie Mae and Freddie Mac. Okay, so that means that it's not an instrumentality. It's not a federal instrumentality. That's correct, Your Honor. Okay, so you don't get the supremacy clause argument that comes out of McCullough. You don't get that principle. Right. So that then throws it all onto the Commerce Clause. Right. Where there is quite a bit of authority of the first agriculture case being a pretty easy one. But you have to recognize that that was an instrumentality. It was a bank. And it sidestepped the decision as to whether or not it was an instrumentality. It made the decision. So if we take the premise that. They decided to go with the Commerce Clause question first.  Right. So they began with the question as to whether Congress had enough authority under the Commerce Clause, assuming that it wasn't an instrumentality to do that. Because if it's an instrumentality, then it's easy. You just cite McCullough and you're done in a paragraph. Absolutely. I don't disagree with you. So you're running uphill against first agriculture. How do you get around it? I think that the fact that we have a situation where we don't have a governmental actor. We do not have an instrumentality. Yes, but that question is now irrelevant. Your Honor. If we have a government instrumentality, then it's a much easier question. You can't tax them. Even under Commerce Clause analysis, which requires the rational basis test that we've described, where there has to be clear and manifest language. Where there has to be a clear and manifest language. There has to be legislative history under Morrison and Lopez. And there should be a jurisdictional limitation. Even under that, when we look at that and we look at the situation that first agriculture comes up with, we should come to the conclusion that Congress does not have the authority to exempt Fannie Mae and Freddie Mac from a state tax that is collected on wholly interstate activities within the state on real property existing within the state. The Commerce Clause should not be interpreted so broadly under the rational basis analysis to allow the destruction of states' rights. And that is something that even Nye, in this case's prior opinions, has determined, is something of great value. The history of the Court recognizes the dual sovereignty of government and says, without question, it is significant and it is important and it should not be disregarded. And what we are doing here is we are going down a road where that relationship, under that interpretation, will absolutely give Congress the authority to abrogate any single one of a state's taxes. Your Honors, I don't have anything more to say if you don't have any other questions. No, you know, it's a very interesting issue. It's just that it's hard. You know, you're sort of battling upstream. Your Honor, I am. That's a great word. So many of our sister circuits have looked at it. You know, we have to be sensitive to what they say. And even though we do sometimes stand on our own, I mean, it has to be for a very good reason to part company with the sister circuit. Your Honor, I would just ---- And so, you know, I read those opinions and, you know, they seem to make good sense. Your Honor, I would just ask, what is more important than the case before the court? What is more important than the policy of protecting legal sovereignty? All right. Thank you very much. It's a very interesting case. Thank you very much. Appreciate your arguments. And although most of the audience left before you came, we do appreciate everything. Thank you very much. The matter is submitted.
judges: Paez, Bybee, Callahan